21-054 Vectura Limited v. GlaxoSmithKline. Mr. Lee, whenever you're ready. Thank you, Your Honor. May it please the Court, this is Bill Lee, and together with my partner, Tom Saunders, I represent GlaxoSmithKline. Vectura secured a $106 million judgment without ever conducting dispersion testing on the actual FDA-approved products accused of infringement, but it did not, and it offered no evidence of dispersion testing of that actual product. Instead, Vectura chose to try to prove infringement based on, as you know, an older study of experimental blends, which had- Mr. Lee, Mr. Lee, I'm sorry to interrupt so early, but I just, to be clear, I don't know what you're talking about. I'm talking about something-I take it that GSK also didn't provide evidence of a test? GSK did not test the FDA-approved products for the purpose of demonstrating the improved dispersion. Yes, Your Honor. Both sides kind of dodged actually testing the product. I recognize that the other side has the burden of proof on infringement, but neither side, it seems like, wanted to take that step for whatever reason. That's correct, Your Honor, and I think that I can't comment on Vectura's perspective, but from ours, the question of the burden of proof was important, and the fact that we were responding to their proof, Vectura's proof, was important to us. And that's why, Your Honor, if I were to pick up where I left off, the fact that the older study had uniformity problems, was made in a different way using different equipment, and, in fact, didn't even include one of the active ingredients of one of the accused products, all are critically important to the appeal. In my time this morning, I'd like to focus on three issues quickly. First, the dispersion limitation, and the dispersion limitation specifically. Then I will turn quickly, if I have time, to two issues on damages. One, the repeated attempts to minimize the damages by comparing GSK's billions of dollars of sales to the requested release, and the decision to jettison the royalty cap of the allegedly comparable license. So, if I move directly to non-infringement, Claim 3 is the only asserted claim, and it had two critical limitations. One is composite active particles, but there was an additional limitation, a separate limitation with separate requirements, which is critical, and that is that that composite active particle, the composite active particles, pardon me, promotes the dispersion of composite active particles, the dispersion limitation. The district court construed that claim limitation specifically. Neither Victoria nor GSK disputes that claim construction, and that claim construction required proof of increased dispersion of the active material as compared to the same composition where unmodified particles are substituted for the composite active particles. And in articulating that claim construction, the district court made two things clear. One is that that proof would have to control for all variables that may contribute to dispersion, and that proof would have to isolate the impact of the composite active particles on the overall dispersion of the composition. The question, therefore, and this is where the question was not whether coating a particle with magnesium stearate can promote dispersion in the abstract. GSK had already licensed Victoria's 224 patent covering coating lactose carrier particles with magnesium stearate. It had paid for that license substantially. That patent covering... Mr. Lee, as I understand it, did not encompass the coating of the active, which is the contribution of the new patent, right? Well, actually, Your Honor, the contribution of the new patent is two things. First, you are correct that the 224 patent covered coating the lactose carrier particles with magnesium stearate. The 991 patent adds two things. It has the composite active particles, but it has the additional limitation, the incremental innovation that requires that that coating have a functional effect, and that functional effect is to increase dispersion beyond that achieved by coating the lactose with magnesium stearate. So that is why, when I said earlier that there are two limitations, composite active particles and improved dispersion, those two limitations have to be considered separately. They each required construction separately, and critically importantly, they each required proof separately. And they did in part because all of the technical folks on both sides agreed that this dry inhalation of powders for use in treating humans and patients were known to be effective. Vectora's inventor said so. GSK's product developer said so. As Your Honor said, Judge Bryson, neither Vectora nor GSK actually tested the FDA-approved product. The record is clear that GSK did provide samples of the commercial products to Vectora. It's clear that if Vectora had the equipment necessary to do that testing, and the record is clear that the district court suggested that that example four of the patent, I'm referring to the patent now, not study two, provided a template for testing whether a composite active particle promotes dispersion. The district court said, here's the requirement, here's what you have to do, example four tells you how to do it. Instead, all we have is study two, and the claim that it satisfies, it is substantial evidence of infringement. But it's not for three reasons. First, study two never tested eumeclidium, or eumec for short. Eumec is the sole active ingredient in the Incruz product, and one of the two active ingredients in the Enoril product. Despite the need for testing under the court's claim construction, there is no dispersion data at all from study two or anything else on composite active particles containing eumec. And again, this is a place where I think the record is relatively clear. Eumec is a different compound with a different chemical structure, with a different formula, with different properties, and different mechanisms of action. Mr. Lee, taking study two off the table for a moment, aren't there several exhibits in which the conclusion from the exhibits is that magnesium stearate, when blended with lactose and the active drug, coat the eumec or the philanderol and produce fine particle dose stability? I'm thinking of PTX-37 and PTX-158, which relate respectively to eumec and philanderol. And Your Honor, this is the collection of documents that are at the Vectora brief, I think beginning at page 11. And actually, if we look at them closely, they really fall into three categories. The first is a set of documents that talk about the formation of that they increase dispersion. That's the 2008 and 2009 GSK technical memos. A second category is technical memorandum from GSK that does talk about increased dispersion from coating lactose with magnesium stearate. This is at appendix 1311 and appendix 50-01. They're not referring to the composite active particles, which, as Your Honor pointed out, is a difference from the 224 patent. They're referring to coating lactose with magnesium stearate. And then the last category, Your Honor, which is the 2013 GSK technical memorandum, is actually what you would call a summary paper, if it had been published. And it includes a summary of one paper by the inventors of the 9-1 patent talking about what might be achieved, but without referring at all to the actual GSK product, and actually not even referring to Study 2. So, Study 2 doesn't test UMAC, and the record actually is undisputed that UMAC reacts differently with lactose than the other active ingredients. Secondly- I'm sorry to interrupt again. No, no, no. No problem, Your Honor. I wanted to make sure I understood where in your set of different categories of documents-and I'm focused really on the documents other than the Study 2 documents-would you put Plaintiff's Trial Exhibit 35? And I direct your attention in particular to Appendix 5014, where we are talking about coating the actives. The minor component in the formulation provides better drug delivery in giving higher foreign fine particle dose than coating the matrix particles, i.e., the lactose. That sounds like it's saying that you get better dispersion if you coat the active. Yeah, Your Honor, that falls into my Category 3, and that actually is the technical memorandum summarizing several papers, including a paper by the inventors of the 9-1 patent, and what you're referring to is actually their summary of that. So, Your Honor, it is-if I were to go back now to the testing, in addition to the fact there's no dispersion testing of the commercial product, no testing of UMEC, there were problems, which we've described in detail, with the Study 2 testing. And stated simply, in part because I'm close to the end of my time, the comparison of Blend 5 to Blend 6 just doesn't satisfy the District Court's admonition that you have to control for all variables that could contribute to dispersion. Blend 5 had substantial uniformity problems, and uniformity problems are lumpiness. And if you have an inhaler, lumpiness is a problem. Blend 5 had-the lower the content uniformity, the better. Blend 5 had a 25 percent uniformity. Blend 6, an 8 percent uniformity. The FDA-approved product, a 5 percent uniformity. That's-if I could just finish this thought, Chief Justice Prost-that is why Study 2 itself, at A6194, says it is not possible to control dispersion due to the poor content uniformity of the blends. So the single piece of evidence that's relied upon says, in black and white, that the comparisons that are being drawn are not ones that could be drawn because of poor content uniformity. And when you combine that with the fact that Blend 5 and Blend 6 were made with different equipment in a different way, in different formulations than the accused product, there is no substantial evidence to support the infringement verdict. And with that, Your Honor, I'll reserve my remaining time for rebuttal. No. We'll restore your rebuttal time, but I just want to spend a couple minutes talking about the damages question and your argument for a new trial. My understanding is-I mean, the number came in. Your side didn't object to the domestic number, and it was used in the context of the comparable license, which, at least the jury could have assumed, satisfied the apportionment requirement. And the profits number came in. It came in in a chart that your side didn't object to. So I think what we're left with is what the judge called out on several occasions, his concern about this pennies on the dollar argument. So assuming that's true, and that's what we're left with, it's hard for me to see why that's enough, or at least enough so that we should not rely on the district court's judgment under an abusive discretion standard and say it was not sufficiently prejudicial to require a new trial. It's-let me answer the question this way, Your Honor. The contention here is that there's a comparable license, and for that comparable license, apportionment is built into that comparable license. In that context, the-you can use, as the district court said, the same revenue base as is used in the comparable license. The problem here is that, as the district court found-and I'm referring to Appendix 22 to 23-the 10 references that we have cited, to your honor, were not-and I'm quoting the district court-were not focused on proving the value of the patented invention, but rather on advancing the pennies on the dollar argument that Bakhtarov was told not to make. Now, we objected on the second day of the trial. The district court objected itself. Importantly, the district court said at A1339 to 1340, there's clearly no waiver here. So I think, Your Honor, if you take this court's decisions on comparable licenses, built-in apportionment, yes, the total revenues are going to go in, but they go in for that purpose. They don't go in as the first line of the opening. They don't go in in cross-examining every witness who testifies. And then, they certainly don't go in to make, as the district court said, the pennies on the dollar argument. This is one of those rare circumstances where we don't have to guess at what the purpose was, because at A1961, counsel said, when Bakhtarov was admonished for doing it... I'm sorry to interrupt, but the question isn't what the purpose was. The question is the district court's judgment that these statements were not significantly prejudicial to require a new trial. Your Honor, I can answer it this way, I hope, precisely. The district court made findings and agreed with us all the way up to the question that Your Honor has posed now, which is, was there prejudice? The district court said there was no prejudice because the number was going to go in. Our argument, to be as precise as I can, is yes, the number is going to go in, but it doesn't justify what happened, and it doesn't justify using it repeatedly. And to the extent that plaintiff's patentees are going to rely upon built-in apportionment, vacant apportionment, and revenue bases from comparable licenses, the total revenues are going to come in in many cases. It can't be, we suggest, that fact justifies the type of repeated references to the billions of dollars of sales. So we agree with everything the district court said right up to the conclusion on prejudice, but his conclusion on prejudice was predicated upon only the fact the number was going to come in. And as district court said in Erickson, the number can come in, but it can come in in a way that isn't for what the court there characterized as illegitimate purposes or pennies on the dollar. All right, thank you. We'll restore you, but let's hear from the other side. Yes, may it please the court. The compositions of the accused formulations are quite straightforward. They each contain magnesium stearate-coated lactose and magnesium stearate-coated active, nothing more. And the other excipients aren't there besides those two components? No, it's just magnesium stearate-coated lactose and magnesium stearate-coated active, that's it. No other excipient at all? No other excipients at all. All right. And the jury heard undisputed evidence about the properties of magnesium stearate. For example, GSK's expert conceded that magnesium stearate prevents particles from sticking to one another. Mr. Borrello, can you hear me? This is Judge Wallach. Yes. Yes, your honor. Yes, your honor. I apologize. I wasn't sure if I was hearing you correctly. Okay. I have some questions about the damages issue that Mr. Lee discussed at the end.  Vectura notes that at sidebar, the district court told Vectura not to talk anymore about the $3 billion figure and claims that Vectura complied and never mentioned GSK's sales again for the duration of the trial. In the very next question, however, Vectura asked its expert to confirm that proposed damages were only 0.187% of GSK's sales. Am I correct on that? It's correct that what we understood the judge, your honor, in this instance to be asking for is not to address the billion dollars in revenue, the billion dollars in sales. What we were what GSK's expert there was arguing that 3% was holding GSK over a barrel. And so we were addressing the distinguishing between the two requests. So our view was that it was the sales figures themselves, the billion dollar sales figures themselves that were prohibited. The district court's warning during that sidebar was at least the second time Vectura was warned not to make similar arguments, right? Right. And we understood that, again, to mean that I didn't want to hear the billion dollar sales figures anymore. Not that it was in fact to discussing what the actual percentage of, because we did need to address profitability of GSK's products in a comparison of what the Did you ask the court to clarify its warnings to you? No, your honor, we did not. Victor was previously warned that, and I'm quoting, sales should not be in any way emphasized beyond what's strictly required by the law. And also about appealing to the jury's emotions through pennies on the dollar arguments, right? You're correct, your honor, in terms of what the judge said there. Again, our understanding, the reason why we did not see clarification is our understanding is that at various points, what had been discussed was the billion dollars in sales and not a comparison of what each royalty rate was being suggested by the experts themselves and how they were impacted or not by GSK's profitability. So it went to our understanding being that the judge's instructions were directed towards the billions issue. On page 42 of the red brief, Vector argues, I'm quoting from your brief, that the court's objection did not eliminate GSK's obligation to object. And then you say, in fact, the district court, quote, told GSK three times that GSK still needed to make objections. Let me drill down on that. The district court informed the parties that the court would make its own objection to arguments that emphasize sales beyond what is strictly required by law and those that appeal to the penny on the dollar emotions. But the district court's instruction that GSK still needed to make objections, as I see it, at J1437 and 1440, was about issues and other particular points. Where in the record did the district court explicitly instruct GSK that it would still need to make objections to arguments that emphasize the sales and the pennies on the dollar? Our understanding, your honor, was that at page appendix 1440, that's what the court was getting at. So that the court clarified twice with GSK's counsel that you still need to make objections, not limiting that to the context of the discussion had just ended with the pennies on the dollar and the billions, et cetera. So those two clarifications to GSK's counsel said you still need to argue, you still need to object. And if things can be corrected, for example, if Vectora's counsel could modify one of its slides or demonstratives, then you need to continue to object. So our understanding was that GSK was obligated to object. Can I ask you, and we will make sure you have a few minutes to respond to Mr. Lee's argument with regard to infringement and Judge I'm looking at appendix 26, 23, I'm sorry, where the district court resolves this issue. And I think Mr. Lee was correct. What he all I see him saying is that he didn't find the introduction of the total revenue figure to be so prejudicial. And then he has a footnote, and I don't purport to understand it, but he says from either the record that any error involving the damages case would have infected the remainder of the trial, such as infringement and infallibility. So I'm not looking at whether infested infringement and validity, we're dealing with the question of a new trial on damages. So he never, what I'm missing is he never deals with an issue that he thought was really relevant throughout the trial was his concern about the pennies on the dollar question and the repeated and unnecessary emphasis of the billion dollar figure, not simply the introduction of the total revenue figure. So where is the analysis that I'm looking for on why this wasn't sufficiently prejudicial to warrant a new trial? What does the district court give us on that point? Well, the district court did address at page appendix 22, that plaintiff emphasized the relative smallness of the damages award it was requesting in comparison to defendant sales and profits on the accused products. So there, the district court was addressing this issue that was at hand and ultimately what the judge decided was that there was no prejudice here. So certainly the judge down below did address the issue as to whether he addressed it in his ultimate conclusion at appendix 23, you know, it's not mentioned there, but it's mentioned in his analysis. Okay. Do you want to go back to where you, sorry. I'd like to pick up with your citation that you gave me to the record at 1440, uh, where you say, uh, you told me that the judge referenced, uh, the, um, the pennies on the dollar and so on right before he said, you still have to make a particular point. Uh, that is if there's some particular point, you need to make an objection. Do you recall telling me that? Yes, your honor. Okay. Well, I'm looking at, so let's go to, uh, 1439 last paragraph. You know, I don't think there's that much difference between saying is 3% of sales and there's 45 million or 1.5 million and 3% of that is 45 million. But I think the key thing is what Mr. Black did say, which clearly is not waived at all, which is you can't appeal to life. It's just pennies on the dollar. So what's the big deal? And I certainly don't think the sale should be in any way emphasized beyond what's strictly required by the law. So if I hear that happening, I will make my own objection and I will sustain it because that shouldn't be an argument. And then he says in an intervening paragraph, in terms of non-infringing alternatives, first I've heard about that or I think that was mentioned by Mr. Black this morning. And again, I think that's best at this point dealt with in cross examination. So one of the things Mr. Black, something you understand I already, I know, but if there's some particular point that comes up, you need to make an objection. But on this sort of general thing, I'm not going to proclaim the damages expert based on essentially arguments back and forth that should have been made a long time ago. How is all of that supported of your argument that counsel had to make particular objections about pennies on the dollar and the general appeal? Well, because in the context of this same exchange with the court, one of the arguments that GSK's counsel was making was that Ms. Schenck here, Victoria's expert, should not be permitted to rely on the billion dollars in sales. So there was back and forth about that aspect as well in terms of whether or not the billion dollars in sales ought to come in or not. And what the court had said was that you had a similar argument in your motion in Lemonet, and it was pretty close to what we had here. And I think it was waived. And in fact, he said that he thought it had been waived twice. So our understanding of this context about also the damages expert here, arguments back and forth that could have been made a long time ago, was inclusive of the arguments that GSK was raising about the billion dollar sales that they were making. Go ahead. Okay. In terms of infringement, turning back to that aspect, so again, the jury heard undisputed evidence about the properties that GS expert conceded that magnesium stearate prevents particles from sticking to one another, and that the ability of magnesium stearate to increase dispersion in inhalers was known. And this document at Appendix 5001, it's a GSK 2014 formal technical document about magnesium stearate, and it's expressly intended to be used wherever GSK's elliptic products are approved. And it says that magnesium stearate was included to stabilize the size of the actives. That is to keep them small. So it's not about the lactose. It's about stabilizing the size of the active. And that makes sense because GSK admits in its opening brief that unmodified active reaches, unmodified active small enough to reach the lungs, becomes larger, and it ultimately is prevented from reaching the lungs, and the result is lower dispersion. And that same 2014 document says that the mode of action of magnesium stearate is understood to coat particles and reduce inter-particle interactions. And then Vectoria's expert testified that when used as a coating, magnesium stearate reduces inter-particle interactions and will improve dispersion. So, of course, that, too, makes sense because by permitting them to reach the deep lung, which increases dispersion. So all of the foregoing applies to both GSK's philanthral and eumeclidinium formulations. GSK's internal magnesium stearate documents don't distinguish between the two additives. I do want to focus a little bit on the court's, if I have time, on the court's test because there, what the court had stated specifically in footnote 9 of appendix 64, that if a POSA wanted to determine whether composite active particle C2 increased dispersion compared to active particle C1 in a composition also containing particles A and B, she would not vary A and B during testing. So it went to the composition, and the composition should not be clarified. Study 2, in particular, it had magnesium stearate-coated active in blend 6 and magnesium stearate-coated lactose. And the commercial formulations also contain magnesium stearate-coated lactose and magnesium stearate-coated active. So there are no additional- the additional ingredient that Mr. Lee, I believe, was referring to, GSK's counsel was referring to, is in a separate blister. It's fluticasone in the Brio product, so these don't come in contact with one another inside the inhalers themselves. Further, in terms of blend 1 and 5 and the content uniformity, to measure content uniformity, you take a small sample from a blend and compare how much drug is in each one of those small samples. And ideally, you want consistency. And when you have just active and lactose in a blend, so blend 1, the active sticks to the lactose and the mixture becomes ordered or homogenous. And that's discussed, for example, at Appendix 5851. So it's no surprise that blend 1, which contained just active and lactose, was homogenous and had adequate content uniformity. But when you turn to blend 5, which is the same as blend 1, except that the lactose is coated with magnesium stearate, well there, the magnesium stearate is a lubricant. GSK's expert admits that at Appendix 1731 to 32. And now, the active can't stick to the lactose. And we know from GSK's opening brief that small particles are sticky. So instead of sticking to the lactose, they stick to each other. And the result is what GSK's fact witness called snowballs throughout the blend. So in terms of content uniformity, one small sample may have a snowball and another may not. And content testified that there was a correlation between poor dispersion and poor content uniformity. GSK calls it speculation, but GSK itself came to the same conclusion at Appendix 6193 and 6194. And GSK, in its reply, also argues that blend 1 illustrates that even without any magnesium stearate, that improvements could be achieved with better content uniformity. And while that's figure 2 at Appendix 6193 shows that blend 1 dispersion dropped from greater than 30% to below 5% in order of magnitude in five short weeks. So the dispersion there was not stable, whereas blend 6 dispersion was stable with no drop-off shown in that same figure. I did want to focus on claim construction if I still have time. And it goes to GSK's waiver. I want to clarify what they're requesting here on appeal versus what it argued below is their proposed construction is simply meaningfully different. Their actual proposed construction down below is at Appendix 51 at Term 3. And it was particulate entities formed by milling a uniform blend of only additive particles and active particles using sufficient energy and duration to ensure sufficient breakup of agglomerates of both constituents, dispersal and even distribution of additive over active of the particle. What's important there is that GSK argued that the energy should be sufficient energy and duration to achieve a particular purpose, which is articulated by GSK, for example, to sufficiently break up the agglomerates, whereas now GSK is arguing that a given process such as its TRV must be defined somehow as a high energy mill regardless of what it achieves. So put another way, GSK is arguing that such a process as its TRV used in the commercial formulations must qualify as a high energy mill regardless of what the end result actually is. I did want to circle back to the allegation of prejudice for a moment and, you know, that in that we needed to address, through the Georgia-Pacific factors, a consideration of the profitability in evaluating the reasonable royalty, in particular with respect to the jury instructions, which GSK doesn't allege were improper. We needed to establish the profitability of the infringing products, their commercial success, and we needed to address the amount that a prudent licensee would have been willing to pay as a royalty and yet be able to make a what the request was, the reasonable royalty, to the actual profits of the accused products. And, again, as GSK did not address or did not object to doing so. The only last thing I'd point out is with respect to eumethyldinium, again, Study 2 applies to eumethyldinium because also the same excipients are present. It's lactose-coated magnesium, stearate, and lactose-coated active as well. Thank you, Your Honor. Thank you. Mr. Lee, we'll enjoy your three minutes. Yes, Your Honor. I'll be brief. I have three points. On this question of the proof of that eumeth reacts differently to lactose than the other active ingredients, and that's at A1555. And the only evidence, the only evidence that Vectora offered was the conclusive statement by its expert that eumeth is also a drug particle. That isn't enough to bridge the gap between Study 2, even if it was valid in eumeth. Secondly, on this issue of infringement, counsel has collapsed the issues of dispersion and stability. And if the court looks at the Study 2 report, you'll see that one of the purposes, the primary purpose, was to test stability. And dispersion was also addressed. At A6194, the study itself says you cannot reach any conclusions about dispersion for the reasons I've discussed earlier. But there are some conclusions reached about stability. And you might say to yourself, well, how can that be? It's because, Your Honor, stability is within a particular sample, not comparing across samples. Dispersion is comparing blend 5 to blend 6. The stability analyses were within a particular blend over time. So there are two different concepts which were collapsed during counsel's argument. It's only the dispersion that's relevant to us. Second point, as I hear the argument, it is that improved dispersion, the function of improved dispersion follows as night follows the day. If you create a composite active particle, or to go to Judge Bryson's first question, if you coat both the lactose and the active ingredient. But that can't be because if improved dispersion followed as night follows the day, then the improved dispersion limitation, which was construed specifically by the court, would have no meaning. It would just be the natural consequence. And that's not what the court said. And that's not what the patent says. Last point on this issue of damage is to go to Judge Wallach's questions. The district court itself said that there clearly was no waiver at all on these issues. And then at the end, at A-1961, Victoria State, when it was asked not to do this anymore, quote, I probably mentioned it enough today already, but I think that they'll remember it. Well, the answer is they did. And it goes not just to validity and infringement, which is what the footnote at A-23 is discussing, but also to justifying a damages claim that is outsized. And it's the pennies on the dollars argument that accomplishes that. Thank you, Your Honor. Thank you. We thank both sides and the cases submitted. That concludes our proceeding for this morning. The honorable court is adjourned until tomorrow morning at 10 a.m.